Dominic S. Rinaldi, J.
In this article 78 proceeding, petitioner, an applicant for regular licenses as teacher of industrial arts in both day high school and junior high school in the City of New York, passed the written, interview and performance parts of the examinations but was rejected for what respondent alleges to be “heart condition” in his physical and medical examination. He asks for a judgment directing respondents to give him a satisfactory rating in such physical examination and to issue the licenses accordingly.
Petitioner is and has been since 1961 a licensed substitute teacher of industrial arts in day high schools. He has been employed since 1961 as a regular substitute teacher in his subject in Erasmus Hall High School. In addition, since September, 1966 he has held a second job with the Bureau of Community Education of the Board of Education as a teacher of repairs, and has been assigned duties as a maintenance and repairman for after-school centers. He attaches to his petition a report on teaching service dated April 4, 1967 made by the principal of Erasmus Hall High School. This report, which is intended to be an evaluation of applicant’s service record and was apparently submitted in connection with his application for the licenses, recites that petitioner had as of that date served a total of 992 days since 1961 as a substitute teacher of industrial arts in Erasmus Hall High School. In six of seven *252 particulars, applicant was rated " superior ”, the highest possible in this form, and in the seventh was given the next highest rating — " good ”. The nature of the work to which applicant was usually assigned is described as "difficult”. A summary comment on the back of the form reads as follows: ‘ ‘ Applicant has rendered exceptional service as a teacher. He is genuinely concerned with the welfare of the youngsters in his charge. He is well-organized, energetic, and a conscientious teacher. His chairman recommends him most enthusiastically. ’ ’
When this applicant took the physical examination for his substitute license in 1961, some question arose as to his fitness because of an alleged heart condition. After communication with the applicant’s own doctor and consultation between respondents’ physicians, respondents state that because of the urgent shortage of teachers at that time, the license was issued subject, however, to the qualification "fit TLO ” (this license only). There is nothing shown on the license, a copy of which is attached to the moving papers, to show this qualification. The effect of such limitation, respondents say, is that it leaves in reserve the question of applicant’s physical fitness in any future examination.
The prime cardiac defect disclosed in the examination for such license in 1961 was an aortic stenosis, a narrowing of the aorta and a failure by the aortic valve to function properly as a result of calcification. In an effort to compensate for this disability, applicant’s heart became enlarged and he developed symptoms of angina. In November, 1964 he submitted to an operation at H. S. Public Health Service, National Heart Institute, Bethesda, Maryland, which operation involved replacement of the aortic valve with an artificial valve. With respect to this cardiac deficiency, the nature of the operation and its possible results, I find most informative the affidavit of applicant’s attorney which was submitted in support of the petition here:
" To state the problem simply, the Petitioner appeared to have had calcification of the aortic valve of undetermined origin. The aortic valve pumps blood to the body and various organs. The operative procedure on November 24,1964, although delicate, is simple in result. From the root of the aorta the natural valve is excised and an aortic ball valve prosthesis sutured into place. The ball valve is then operated and activated by the natural rhythm of the heart. The valve has no electronic parts and is not in any way connected to the outside of the individual.
*253 “ I had an identical operation performed in June of 1963, well over four years ago. I returned to my law practice shortly after the operation and have been fully active in such practice since that time. I live a completely normal life and am for all intents and purposes a normal individual with normal expectation of a good life in the future.”
In April, 1965 the petitioner, without applying for any license, requested the Board of Examiners to give him a physical examination and to furnish an opinion as to his medical fitness. Respondents say that they agreed to such request as a courtesy only. This resulted in an “ unfit ” determination without any specific medical findings or other elaboration. Applicant’s appeal from this conclusion to the State Commissioner of Education was dismissed as premature on the ground that the appellant was not a candidate for any license and he was therefore ‘ ‘ not even an aggrieved party. ’ ’ The Commissioner further stated in his determination, in what I must under the circumstances treat as an obiter observation, that he would not substitute his own judgment for the findings of respondents’ physician.
In 1966 petitioner applied for the regular licenses which are the subject of this proceeding. Having passed all other parts, he submitted to a physical examination in February, 1967. The final determination of unfitness was made after examination by respondents ’ doctors, submission by applicant of a report from his own doctor, and an asserted evaluation of all available information and records and consultation by and between respondents’ medical staff. The notice to plaintiff of his rejection for physical unfitness informed him that a statement of the reasons for such unsatisfactory rating would be furnished upon request. He made such request and a copy of the response is attached to his answer as Exhibit 6. It states simply, “ Heart disease ’ ’. Plaintiff and his counsel state that every demand and effort since then to obtain any information as to the record and findings leading to this conclusion have been fruitless.
Respondents assert in their answer that ‘ ‘ the conclusion of the medical staff was based mainly on the deterioration of petitioner’s cardiac status ” (emphasis supplied). This reference to a “deterioration” or “worsening” in applicant’s cardiac status is repeated again and again in respondents’ papers. In the absence of any of the findings or records of respondents’ own examining physicians, I can only surmise that their opinion and conclusion rest upon the records and opinions furnished by petitioner and his doctors. I have therefore closely examined *254 such of these records as are before the court in this proceeding to find support for the determination that petitioner’s condition has “ deteriorated I have been unable to find any reasonable basis for that position in these records. I must agree with petitioner and his counsel that his difficulties with renal calculi (kidney stones) within recent years cannot be characterized as “heart disease ”, the only reason assigned by respondents for rejection. Additionally, the cystoscopy procedure to which petitioner submitted in 1966 resulted in the elimination of the troublesome kidney stones and the accompanying hematuria. Similarly, the blurred vision which troubled petitioner in June, 1966 and was ascribed to a cerebral embolism has been cleared up and has apparently not recurred. I do not know whether that can properly be described as “heart disease ” but in August, 1966, prior to the time when respondents’ physicians conducted their examination, the records of the hospital which treated applicant for this condition stated: “ Recent cerebral embolus, recovered.”
Petitioner’s condition following the operation involving-replacement of the aortic valve has been variously described by his physicians as “ good ” to “ excellent ”. Aortic function has been characterized as “normal”. Heart enlargement, which was symptomatic of the valvular stenosis prior to the operation, was shown by X-ray examination a year afterward as indicating “ a striking reduction in size.” Reports to respondents’ physicians advised that anginal symptoms have disappeared and there is no evidence of cardiac failure. Examinations in subsequent years have not disclosed any retrogression. If the examination by respondents’ physicians showed any objective findings to the contrary, they have not revealed or produced them here. Their determination that petitioner is physically unfit and that any prior disability is continuing because he is still under medication is not borne out by the records before me. He was discharged after a post-operative checkup by the National Heart Institute with the following-notation :
“DISCHAEGE MEDICATION'S: None.
RETURN APPOINTMENT: Nolle.”
There is no factual basis for the statement by Dr. Leibowitz of respondents’ staff in his affidavit attached to the answer that petitioner is now taking digitalis. As for coumadin, the anticoagulant, which petitioner does now use, I am satisfied that it is only a temporary precaution to guard against possible embolisms and will probably be discontinued in the near future. *255 It was recommended by petitioner’s local physician, not by those who performed the cardiac operation and supervised his aftercare. In these circumstances, I cannot find any justification for the determination by respondents’ doctors that there has been any deterioration in petitioner’s condition.
Petitioner contends that there is sufficient affirmative proof before the court to establish his physical fitness to perform the duties in the licensed positions and his right to be so certified by the Board of Examiners. His attendance record even prior to the date of the operation is indeed impressive in the situation. His ability to perform the duties of the positions is currently illustrated by his performance in his present job as substitute. The additional physical obligations undertaken by him in the after-school work in a second job are even more impressive. There has been no criticism on the part of his employer as to the manner in which he has discharged his duties. On the contrary, his present superior, the principal of Erasmus Hall High School, rates his performance in superior terms. As petitioner’s counsel points out, the criteria of the physical tests conducted by respondents require an ability by the candidate ‘ ‘ to render effectively at present or in the immediately foreseeable future the services required in the position ”. Not content to rest on the medical records or the service record of applicant then available to the respondents, he has attached to his reply affidavit a statement from Dr. Andrew Gr. Morrow, Chief, Clinic of Surgery, National Heart Institute, as follows: ‘ ‘ There is no question that at present Mr. Corsover is able to perform effectively in the duties of his position. Also, it would be my opinion that in the immediately foreseeable future that he would continue his present level of physical capabilities.”
Respondents, to support the determination, appear to rely in some measure on alleged failure by petitioner to completely disclose three periods of hospitalization and treatment. Petitioner explains at least two of these admissions as merely postoperative checkups. However, I cannot see how these omissions, if such they are, by petitioner, are relevant here. The only issue before me is his rejection for physical unfitness. Respondents do not base the failing rating on alleged misstatements or omissions by petitioner in his applications. In theory, that is a power which the Board of Examiners possesses if there is substance to the view. They apparently did not choose to exercise it and that is therefore not an objection which is available in this proceeding. In an apparent effort to magnify these “ omissions ” by petitioner in his applications, *256 respondents have adopted what I believe is an unorthodox and unwarranted method of pleading to the petition. As exemplified by paragraphs 5, 6 and 7 in their answer, respondents have not confined themselves to denials or admissions of the allegations made in the petition but have asserted matter which, if at all proper, belongs in an affirmative defense. Where a normal denial or simply a qualified denial might have served, respondents again and again make reference to these periods of hospitalization. There is not even any logic or rationality to their approach. Witness, for example, paragraph 6 of the answer: 1 ‘ Deny so much of the allegations contained in paragraph ‘ 10 ’ thereof as alleges or implies that Dr. Harder’s letter of June 29, 1965 was written with knowledge of petitioner’s subsequent hospitalizations in June, 1966 and August, 1966.” Obviously, these statements are impelled by the zeal of advocacy but I feel that they are gratuitous and prejudicial in the context. I am troubled also by the discussion in respondents’ brief of petitioner’s present substitute license: “The fairness of revoking that license now in light of petitioner’s deteriorating health since its issuance is not tested here.” I hope that statement does not represent a veiled threat to take such action.
Respondents’ counsel, commenting in his brief on petitioner’s accomplishments, says: “Petitioner’s courage and tenacity in face of his many setbacks are genuinely admired”. I must here wholeheartedly agree with him. I would be less than human if I did not also express my respect and esteem for both petitioner and his counsel, who have been shortchanged in physical endowments by an unpredictable providence and have nevertheless managed to rise above these handicaps without seeking favor or help beyond that accorded to others more fortunately situated.
If this matter involved only a conflict in the findings and consequent conclusions between those reached by respondents’ physicians and applicant’s physicians, I would be bound by respondents’ determination (Matter of City of JSew York v. Schoeck, 294 N. Y. 559; Matter of Strauss v. Hannig, 256 App. Div. 662, affd. 281 N. Y. 612). But that is not the situation here. There are clear objective and rational findings and conclusions based upon careful examination and evaluation by petitioner’s physicians. The determination of the respondents, on the other hand, is here supported by no objective medical findings made by respondents ’ physicians and disclosed in this proceeding. Their conclusion of “heart disease” and “deterioration” appears to be based primarily upon surmise and *257 conjecture. Under the circumstances, such conclusion must he Adewed as arbitrary and unreasonable. Accordingly, the determination of respondents that this petitioner is physically unfit for the duties of the positions for Avhich he has made application is annulled and they are directed to issue the licenses to him.